# UNITED STATES DISTRICT COURT
## MIDDLE TENNESSEE DISTRICT OF TENNESSEE

### CASE NO. _____

JIMMY L. COLLINS Jr.
      PLAINTIFF,

v.

| | |
|---|---|
| MORTGAGE ELECTRONIC REGISTRATION ) | COMPLAINT FOR |
| SYSTEMS, INC. AND, ) | EX PARTE APPLICATION FOR |
| MERSCORP, ) | TEMPORARY RESTRAINING ORDER |
| collectively as **MERS**; ) | PRELIMINARY AND PERMANENT |
| CITIMORTGAGE Inc. ) | INJUNCTIONS |
| ) | DECLARATORY JUDGMENT AND |
| ) | COURT COSTS/DAMAGES |
| WILSON AND ASSOCIATES PLLC ) | |

SHELLIE WALLACE - TRUSTEE

      DEFENDANTS

************************************************

Serving Addresses:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
P.O. BOX 2026
FLINT, MICHIGAN 48501-2026

CITIMORTGAGE Inc.
P.O.BOX 660065
DALLAS, TEXAS 75266-0065

WILSON AND ASSOCIATES PLLC
1521 MERILL DRIVE, SUITE D-220
LITTLE ROCK, AR 72211

SHELLIE WALLACE
1521 MERILL DRIVE, SUITE D-220
LITTLE ROCK, AR 72211

1

Plaintiff brings complaint against named Defendants pursuant to 18 U.S.C. §1962 and 18 U.S.C. §1964 otherwise known as the "Racketeer Influenced and Corrupt Organizations Act," hereinafter ("RICO") and for all violations of law heretofore claimed.

On Wednesday, October 13, 2010 Tennessee Attorney General Bob Cooper joined the Mortgage Foreclosure Multistate Group, a coalition of 50 attorneys general, state-level mortgage regulators and bank oversight agencies to jointly investigate improper foreclosure processing procedures.

*"We want to determine if there are any other types of problems regarding mortgage foreclosure documents in Tennessee and whether there is any kind of troublesome pattern, "* Attorney General Cooper said. In this ongoing investigation, the Mortgage Foreclosure Group's chief focus will be the accuracy and validity of documents that lenders and servicers used to support foreclosure proceedings. Specifically, the states will review whether individuals who confirmed facts supporting foreclosures – either in affidavits or other related documents – actually had personal knowledge of the facts to which they swore.

In recent weeks, some lenders have acknowledged using electronic devices to sign sworn documents. To the extent so-called "robo-signing" was used to sign foreclosure documents, questions arise about the actual personal knowledge of employees whose signatures appeared on the affidavits. Thus, because thousands of documents were reportedly signed electronically, the states will review whether the signer actually confirmed the facts contained in their affidavits. The workgroup will also review whether foreclosure paperwork was signed outside of the presence of a notary

public, contrary to state law. Both judicial and non-judicial foreclosures will be subject to the workgroup's investigation.

On October 10, 2010, the national press began reporting that one of the Defendants, CitiMortgage, had placed a moratorium across the country on foreclosures, based on the illegalities in the policies, practices and procedures of their own employees and the law firms representing their interests in foreclosures. Additionally, and as to the claims of the Plaintiff to this Complaint, the legality of MERS on Deeds of Trust is being litigated in *In Re MERSLitigation,* MDL 2119, United States District Court Arizona.

## I. THE PARTIES

### A. THE PLAINTIFF

**1.** The named Plaintiff brings suit on behalf of himself and the and has standing to sue the Defendants in regard to a foreclosure action relating to the property wherein a Mortgage was or is recorded in the name of MERS against the property.

The Plaintiff's Complaint against the Defendants is as follows:

**2.** Jimmy Collins was and is still a resident at 2137 ERIN LANE, MT. JULIET TENNESSE in Wilson County. Due to unexpected financial hardships he and his wife encountered, the Plaintiff defaulted on his loan after consistently making payments since July 2008, the time he acquired the loan from Mortgage Investors Group. The loan was then accelerated and Plaintiff was told by the Trustee Shelly Wallace, that he either had to satisfy it by paying the entire $186, 843.42 or his home would be sold at a public auction on March 30, 2011, at the Wilson County Courthouse in Lebanon, Tennessee.

3

## II.B. THE DEFENDANTS

**Mortgage Electronic Registration Systems, Inc., MERSCORP, hereinafter**

**collectively ("MERS") and the MERS Shareholders:**

**3.** Defendant Merscorp, Inc., is a foreign corporation created in or about 1998 by conspirators from the largest banks in the United States in order to undermine and eventually eviscerate long-standing principles of real property law, such as the requirement that any person or entity who seeks to foreclose upon a parcel of real property: **1)** Be in possession of the original note, **2)** Have a publicly recorded mortage in the name of the party for whom the underlying debt is actually owed and who is the holder of the original Promissory Note with legally binding assignments, and **3)** Possess a written assignment giving he, she or it actual rights to the payments due from the borrower pursuant to both the mortgage and note.

**4.** Defendant Merscorp, Inc., claims to be the sole shareholder in an entity by the name of Mortgage Electronic Registrations Systems, Inc., ("MERS"). MERS is the RICO enterprise and is the primary innovation through which the conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this Complaint.

**5.** For the purposes of this action, MERS shall also refer to each and every shareholder of MERSCORP, who will be named as their identities are revealed.

**6.** The Complaint names the entity, Mortgage Electronic Registration Systems, Inc., hereinafter, ("MERS").

**7.** MERS is not the original lender for any of the Plaintiff's loans.

4

MERS is not the creditor, beneficiary of the underlying debt or an assignee under the terms of the Promissory Notes of the class members. MERS does not hold the original of the Promissory Note, nor has it ever held the Promissory Notes of the Plaintiff.

**8.** The Mortgagee, MERS, is a owned by the company, MERSCORP, which is in turn owned by a group of Wall Street investment Banks.

**9.** MERS is unregistered and unlicensed to conduct mortgage lending or any other type of business in the State of Tennessee, and has been and continues to knowingly and intentionally, illegally and fraudulently record mortgages and conduct business in Tennessee on a large scale and systematic fashion.

**10.** No promissory Note or other evidence exists which could ever make the Plaintiff indebted to MERS in any way.

**11.** MERS never had nor will it ever have standing to enforce the illegal and fraudulent mortgage it filed against the property in question. MERS never had nor will it ever have the authority to assign the Mortgage to any entity.

**12.** MERS has never possessed a pecuniary or financial interest in the Note of the Plaintiff.

**13.** MERS has never had any right to collect on the Note or enforce the Mortgage, nor has it had a right to hold, enforce or collect upon any of the thousands of Mortgages it has fraudulently recorded throughout the State of Tennessee, in the 50 states, the District of Columbia and all other US Territories.

5

**The Law Firm:**

**14.** In or about the last decade, the Defendant Law Firm Wilson and Associates joined with Defendant Merscorp, Inc., and other conspirators in the fraudulent scheme and RICO enterprise herein complained. The employees of the Defendant Firm, including many licensed attorneys, have become skilled in using the artifice of MERS to sabotage the judicial process to the detriment of borrowers, and, over the past several years, have routinely relied upon MERS to accomplish illegal acts.

**15.** Wilson and Associates PLLC, is a law firm with its principal place of business in the state of Arkansas, and the firm is one of the regional foreclosure mills, and the regional corporate counsel for CitiMortgage.

### The Trustee and MBS "Trusts"

**16.** Shellie Wallace, is a Successor Trustee for MERS.

**17.** CitiMortgage is a foreign business entity, which according to the MERS internet web site, www.mersinc.org, is a shareholder in MERS.

### II. JURISDICTION AND VENUE

**18.** The Court has original and subject matter jurisdiction over the Plaintiff's statutory and common law violations of RICO.

**19.** Venue is proper in this Judicial District as the Plaintiff's property is located in Wilson County, Tennessee. Defendants have conducted business, albeit illegally in this County and throughout the one hundred and twenty (120) Counties in Tennessee and throughout the United States by filing tens of thousands of fabricated, illegal and

6

unenforceable Promissory Notes, Assignments of Promissory Notes, Affidavits as to loan ownership and Status of Accounts, Mortgages and Assignments of Mortgages.

## III. INTRODUCTION

20. This case arises due to the fact that for the Plaintiff, the Mortgage and the foreclosure is based upon a mortgage and a Note in the mortgage that is not held by the same entity or party and are based upon a mortgage that was flawed at the date of origination of the loan because Mortgage Electronic Registration Systems ("MERS") was named as the beneficiary or nominee of the lender on the mortgage or an assignee, and because the naming of MERS as the beneficiary was done for the purpose of deception, fraud, harming the borrower and the theft of revenue from all one hundred and twenty (120) Tennessee Counties through the illegal avoidance of mortgage recording fees.

21. For purposes of this Complaint the term "Mortgage" shall include the term "Deed of Trust."

22. In this case where a foreclosure has been filed, the entity filing the foreclosure has no pecuniary in the mortgage loan. The foreclosing entity is a third party. The entity lacks standing, and most times, the capacity to foreclose. The entity has no first hand knowledge of the loan, no authority to testify or file affidavits as to the validity of the loan documents or the existence of the loan. The entity has no legal authority to draft mortgage assignments relating to the loan. The foreclosing entity and its agents regularly commit perjury in relation to their testimony and sworn affidavits.

23. The "lender," on the original Promissory Note was not the lender. The originators of the loan immediately and simultaneously securitized the note. The beneficial interest in

7

the note was never in the lender. MERS, acting as the mortgagee or mortgage assignee, was never intended to be the lender nor did it represent the true lender of the funds for the mortgage. The true owner or beneficiary of the mortgage loan has not declared a default and usually no longer have an interest in the note. The Trusteee does not have the permission of the beneficial owners of the Note to file foreclosure on their behalf.

24. Defendants have and will cloud the title and illegally collect payments and are attempting to foreclose upon the property of the Plaintiff when they do not have lawful rights to foreclose, and are not holders in due course of the Note.

25. Any mortgage loan with a Mortgage recorded in the name of MERS, is at most, an unsecured debt. The only parties entitled to collect on the unsecured debt would be the holders in due course and beneficial owners of the original Promissory Note.

26. This is a Complaint brought for violations of Tennessee and Federal law. It is brought because the entities lack capacity (fake Trusts), and lack standing as a real party in interest to the underlying debt; which would exist in the form of a negotiable instrument, a Promissory Note.

27. Although the loan transactions in question contain several violations of Federal and state statutes and common law torts, which have been perpetrated, this Complaint also concerns violations of law pertaining to the improper and illegal drafting, execution and public recording of Affidavits, Mortgages and Assignment of Mortgages used to illegally divest the Plaintiff of title to his property.

28. In addition to damages, the violations have created and continue to create a permanent cloud on the Plaintiff's title. This cloud potentially affects not just the

8

Plaintiff, but also every resident of Tennessee and the United States as all have the potential to be the title holders of the clouded property. It also affects land records in relation to the titles illegally divested.

29. A pattern and practice was invented by the Servicers, MBS Trusts, the document processing companies and law firms to procure fraudulent and forged documents for the sole purpose of creating a fraud in the public record in order to illegally take property in foreclosure.

30. Certain individuals who were the employees of the law firm executed and notarized forged documents as to the ownership of the loan. They have committed widespread counts of fraud, perjury and forgery in the tens of thousands. These forgers have been referred ton in the press with the vernacular term "robo-signers."

31. In these cases, the property could be foreclosed by default, sold and transferred without ANY real party in interest havening ever come to Court and with out the name of the "Trust" or the owners of the mortgage loan, ever having been revealed. Many times the Servicer will fraudulently keep the proceeds of the foreclosure sale under the terms of a Pooling and Servicing Agreement as the "Trust" no longer exists or has been paid off. The Court and the property owner will never know that the property was literally stolen.

32. After the property is disposed of in foreclosure, the real owners of the mortgage loan are still free to come to Court and lay claim to the mortgage loan for a second time. These parties who may actually be owed money on the loan are now also the victims of the illegal foreclosure. The purchaser of the property in foreclosure has a bogus and

9

clouded title, as well as all other unsuspecting buyers down the line. Title Insurance would be impossible to write on the property.

**33.** The "Trusts" coming to Court are actually Mortgage Backed Securities ("MBS"). The Servicers, are merely administrative entities which collect the mortgage payments and escrow funds. The MBS have signed themselves up under oath with the Securities and Exchange Commission ("SEC,") and the Internal Revenue Service ("IRS,") as mortgage asset "pass through" entities wherein they can never own the mortgage loan assets in the MBS. This allows them to qualify as a Real Estate Mortgage Investment Conduit ("REMIC") rather than an ordinary Real Estate Investment Trust ("REIT"). As long as the MBS is a qualified REMIC, no income tax will be charged to the MBS. For purposes of this action, Trust" and MBS are interchangeable.

**Real Estate Mortgage Investment Conduit (REMIC):**

**34.** Although the Defendants like Shellie Wallace attempting to foreclosure refer to themselves as "Trustees" of a "Trust," the entities are not "Trustees" nor "Trusts" as defined by Tennessee law. Neither are the entities registered as Business Trusts nor Business Trustees as required by Tennessee law. In every case, where one of these Mortgage Backed Securities have come to a Tennessee Court, the entity foreclosing lacked capacity to foreclose or to file suit in the State of Tennessee. There is no "Trust Agreement" in existence. The entity filing has utilized a Tennessee legal term it has no right to use for the sole purpose of misleading and fooling the Honorable Court.

**35.** Although the "Trust" may be registered with the Securities and Exchange Commission ("SEC") and the Internal Revenue Service ("IRS") as a Real Estate Mortgage

Case 3:11-cv-00264   Document 1   Filed 03/22/11   Page 10 of 73 PageID #: 10

Investment Conduit ("REMIC"), more often it is not properly registered in any state of the union as a Corporation, Business Trust, or any other type of corporate entity. Therefore, the REMIC does not legally exist for purposes of capacity for filing foreclosure affidavits or a law suit in Tennessee or any other State.

36. REMICS were newly invented in 1987 as a tax avoidance measure by Investment Banks. To file as a REMIC, and in order to avoid one hundred percent (100%) taxation by the IRS and the State of Tennessee, an MBS REMIC could not engage in any prohibited action. The "Trustee" cannot own the assets of the REMIC. A REMIC Trustee could never claim it owned a mortgage loan. Hence, it **can never be the owner** of a mortgage loan.

37. Additionally, and important to the issues presented with this particular Complaint, is the fact that in order to keep its tax status and to fund the "Trust" and legally collect money from investors, who bought into the REMIC, the "Trustee" or the more properly named, Custodian of the REMIC, had to have possession of ALL the original blue ink Promissory Notes and original allonges and assignments of the Notes, showing a complete paper Chain of Title.

38. Most importantly, the "Trustee"/Custodian MUST have the mortgages recorded in the investors name as the beneficiaries of a MBS in the year the MBS closed." Every mortgage in the MBS should have been publicly recorded in Wilson County where the property was located with a mortgage in the name similar to "2008 XYZ REMIC Trust on behalf of the beneficiaries of the 2008 XYZ REMIC Trust." The mortgages in the referenced example would have had to been publicly recorded in the year 2008.

**39.** As previously pointed out, the "Trusts" were never set up or registered as Trusts. The Promissory Notes were never obtained and the mortgages never obtained or recorded.

**40.** The "Trust" engaged in a plethora of "prohibited activities" and sold the investors certificates and Bonds with phantom mortgage backed assets. There are now nationwide, numerous Class actions filed by the beneficiaries (the owners/investors) of the "Trusts" against the entities who sold the investments as REMICS based on a Bogus prospectus. For example Citigroup which owns CitiMortgage is being sued by shareholders and investors in *(Charles Schwab Corporation v. BNP Paribas Securities et al., Superior Court of California (San Francisco), no. CGC-I0-501610.)* in which the Plaintiffs allege "actionable misstatements or omissions in connection with the issuance and underwriting of residential mortgage-backed securities, and are seeking rescission of their investments or other damages."

**41.** In the above scenario, even if the attorney for the Servicer/Bank who is foreclosing on behalf of the Trustee (who is in turn acting for the securitized trust) produces a copy of a Note, or even an alleged Original, it would be self-incriminating because it would mean that the mortgage loan was NEVER conveyed into the trust under the requirements of the prospectus for the trust or the REMIC requirements of the IRS. It is therefore NOT in the Trustee's best interest to show the Honorable Court the Note, because they were trying to hide this fraud from the homeowner and they also believe

12

they might actually succeed in hiding the fraud they have committed from the Honorable Court.

**42.** As applied to the Plaintiff in this Complaint, the end result would be that the required Mortgage-Backed Security asset, or any part thereof (mortgage Note or security interest), would not have been legally transferred to the trust to allow the trust to ever even be considered a "holder" of a mortgage loan. Neither the "Trust" nor Citimortgage would have standing or be a real party in interest. They will never be the proper party to appear before the Courts. Also neither the "Trust" nor the Servicer would ever be entitled to bring a foreclosure or declaratory action. The crafty lawyers from the foreclosure mill representing the Trustee in this particular Complaint are hoping the Honorable Court doesn't discern their illegal and fraudulent activity regarding the Plaintiff's mortgage, that's why they are in such a hurry to conduct an illegal foreclosure sale of the Plaintiff's home, in hopes that their actions go under the radar and are not picked up by the Honorable Court .

**43.** Any transfer of mortgage loans into the trust after the "cut off date" (in the example 2008), destroys the trust's REMIC tax-exempt status, and these "Trusts" (and potentially the financial entities who created them) would owe millions of dollars to the IRS and the State of Texas as the income would be taxed at one hundred percent (100%).

**44.** Subsequent to the "cut off date" listed in the prospectus, whereby the mortgage notes and security for these notes had to be identified, and Note and Mortgages transferred, and thereafter, the pool is permanently closed to future transfers of mortgage assets.

**45.** In any case, the lack of acquisition of the Plaintiff's mortgage loans violates the prospectus presented to the investors and the IRS REMIC requirements.

**46.** If an MBS Trust was audited by the IRS and was found to have violated any of the REMIC requirements, it would lose its REMIC status and all back taxes would be due and owing to the IRS as well as the state of Tennessee. As previously stated, one hundred percent (100%) of the income will be taxed.

**47.** As the Defendants are identified and the identity of the MBS REMICs revealed through this Complaint, the individual "Trusts"/ MBS REMICs will be turned over to the IRS for auditing.

**48.** Upon information and belief, it is asserted that the IRS is being made aware that a list of alleged "unqualified" REMICs is forthcoming through the identity of the Plaintiff's mortgage loan "Trusts" in this Complaint.

### Securitization and Standing:

**49.** To the judges throughout the State of Tennessee and to the homeowners, the foreclosing Defendants, or "Trust" entity appears to be a bank or lender. This falsity is due to its name in the style of the case. They are not banks or lenders to the loan. They are not a beneficiaries under the loan. They do not possess a Mortgage in the property. They will never have a right to posses a mortgage in the property.

**50.** In such cases, the "Trustee" attempting to administer the illegal home sale and foreclosure is not known to the homeowner. The very first time the homeowner learned that his home was put up as collateral for a publicly traded and sold home loan REMIC (a federally regulated Security) is at the time he was served with a foreclosure notice.

**51.** These "trusts" are actually Mortgage Backed Securities (MBS). An MBS is an investment vehicle, defined and regulated as "Security" by the Security and Exchange Commission (SEC.)

**52.** At the time the Plaintiff signed a Promissory Note and Mortgage, he was unknowingly converting his property into an asset of a MBS. The homeowner was never informed of the nature of the scheme. He was deliberately induced into signing a Negotiable Instrument which was never intended as such, but was intended as collateral for a MBS.

**53.** The fact that the loan was meant to fund a MBS was a "material disclosure" which was deliberately and intentionally undisclosed. The failure to disclose the identity of the true lender at closing was also a "material disclosure;" the nature of which would make the contract voidable under Tennessee contract law.

**54.** Mostly beginning in 2004, hundreds of thousands of residential mortgages were bundled together (often in groups of 5,000 mortgages), and investors were offered the opportunity to buy shares of each bundle, an MBS. Some of the bundles were offered as Bond Certificates, guaranteeing a rate of return. Many of these Bond MBS were funded by large private and governmental pension funds and in some cases, as the case with Greece, by foreign governments.

**55.** Investments were made in the MBS, based on a prospectus, which had to be filed with the SEC. The prospectus was created, the MBS rated and the investors money was pledged and collected long before the homeowner ever even applied for a loan.

15

**56.** In other words, the MBS was created first. The loans fitting the description of those found in the prospectus had to then be created and originated. Each MBS/Trust was required to keep a list of the individual loans they had allegedly recruited for the MBS. This list has to be publicly recorded with the SEC. However, the SEC did not require any proof that the loans actually existed or were possessed by the MBS. For the tax man and in order to qualify as a REMIC, the Notes and mortgages listed with the SEC had to be held, and mortgages recorded ON THE DATE THE MBS CLOSED.

**57.** Each such MBS bundle was given a name, such as "XYZ Home Loan Trust 2008 ABC-8." The name indicates information about the particular trust, such as the year it was created and closed and its reference name and number for the SEC and IRS.

**58.** As required by the SEC, each MBS/Trust has a Pooling and Servicing Agreement ("PSA") which must be publicly filed. The only purpose for the PSA is for the administration and distribution of funds to the investors and the obligation of the so called Trustee in administering the MBS. The investors who put up the money for the MBS and who received the MBS Certificates or Bonds, are not parties to the PSA.

**59.** The PSA merely sets forth what happens after the mortgages are bundled together. However, the PSA also sets forth a Cut Off Date. The Cut Off Date is the date on which all mortgage loans in the MBS/Trust must be identified and set out in the SEC required list of mortgage loans. Often, these loans were identified and listed for the SEC and the investors, regardless of whether the loan existed or had been closed. Some loans were listed in SEC filings in multiple MBS.

**60.** Like the Cut Off Date, each MBS/Trust had a Closing Date. The Closing Date is the date that the individual identified mortgages were to be transferred through the Custodian for the benefit of the investors. The Trust Custodian must certify that for each mortgage loan, the Trust Custodian has possession of the original Promissory Note, all original endorsements and assignments transferring the Note and proof that the ownership of the Note has been transferred for the benefit of the shareholder/investors. Further proof of the ownership of a mortgage loan is required by a public recording of the Mortgage or Assignment of the Mortgage itself. This MUST have occurred by the closing date.

**61.** The Servicers/Banks worked to collect money for the MBS from the individual loans and collected and distributed escrow funds. The "Trustees" were Custodians, akin to administrators.

**62.** Typically, and contrary to the law, the Trust would include equivalent language regarding the handling of these required Assignments: "Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan." This publicly recorded provision to deliberately keep the transfers out of the public record, violates the Mortgage Recording Statute of almost every State of the Union. *(i.e: The clerk of the court shall record photographically any assignment of a mortgage with an attachment or rider affixed to it containing the names of the parties as they appear on*

*the original mortgage and a reference to the book number and page number where the*

*mortgage is recorded.)*

**63.** While attempting to circumvent Tennessee recording Statutes, the MBS Trust

created for itself a situation wherein it had no legally recognizable interest in the loans

for the benefit of the investors. The investors were invested in nothing. The MBS

possessed nothing on the date the REMIC closed and perpetrated a fraud on the

investors and the American taxpayer through its fraudulent qualification as a REMIC

with the Securities and Exchange Commission.

**64.** No bank, lending institution or "Trustee" ever pledged or put up the money for the

Homeowners' loans. The foreclosing entities had or have no pecuniary, ownership stake

or beneficial interest in the homeowners' loans.

**65.** A review of the foreclosures filed by the Servicers and "Trusts" typically states that

the "Trustee" is the "Holder" of the homeowners' Note. The Complaint in foreclosures

never states that the "Trustee is the OWNER of the homeowners' Note.

**66.** More often than not, the statement that the foreclosing entity "holds" the original

Promissory Note is an untruth. The majority of the securitized Notes no longer exist,

having been deliberately destroyed or disposed. At the time the feeding frenzy of

securitization occurred (mostly between 2004 and 2008,) paperwork was of little

consequence as the goal of the originators was to fill and securitize as many loans as

possible in order to create the loan number list for the SEC. Likewise, whether or not the

loans were ever repaid was of absolutely no consequence as the Servicers and "Trusts"

had nothing to loose; the loans having been funded by the investors and were insured by multiple derivative contracts or Credit Default Swaps.

67. Often, the bank or servicer would have a provision in its Pooling and Servicing Agreement which would allow it to collect and keep the proceeds of any foreclosures it could accomplish after the MBS Trust was paid off by derivatives and closed. Often, a Servicer will show up in a Tennessee Court to foreclose on behalf of a Trustee who administers a MBS Trust which no longer exists.

68. When the scheme was originated and implemented en mass (mostly between the years 2004 and 2007), what was not planned for or counted upon was the immediate 2008 massive real estate market collapse and the thousands of voluntary and involuntary defaults and Truth In Lending Act (TILA) loan rescissions of mortgage loans. At the same time, the fair market value of housing dropped by as much as fifty percent (50%) in some parts of the country.

69. No legal plan was in place for such a wide spread loss of the assets. No legal plan was ever in place to deal with the fact that the original Prospectus to the shareholder/investors was a myth. No legal plan was ever in place for the shareholder/investors to come to Court in an attempt to collect on the assets of the MBS they purchased.

70. Most importantly for Tennessee non-judicial foreclosures or Declaratory actions, the investors or beneficiaries did not have contracts with the Trusts, Servicers, or Trustees to act on their behalf in a suit in foreclosure or foreclosure sales or otherwise.

19

**71.** In order to collect on the mortgage loans and divest Americans of their homes, Servicers and "Trustees" have had to mislead the Courts as to their standing in foreclosure. They have had to create, forge and fabricate phony documents in order to obtain an Order of Sale in Foreclosure, and in non-judicial states they have filed fake and forged affidavits with the County Clerks office giving the false impression that they had legal standing to sell the homes. All the homeowners in Tennessee whose homes have been foreclosed and sold at the steps of court houses have no idea that those Trustees and Servicers were simply "Pretender-Lenders" with no standing to make them homeless using illegal and fraudulent schemes.

**72.** Because of the fraud committed in these illegal foreclosure sales, by banks like Citimortgage and Regional Foreclosure Mills like Wilson and Associates, thousands of homeowners have gone from sleeping in a warm bed to being out in the cold streets.

**The Creation and Use of Fraudulent Affidavits and Mortgage Assignments:**

**73.** In a foreclosure, the MBS/Trustee claims to be acting on behalf of the MBS/Trust and claims that it has acquired the loan from the originator. The multiple transfers of title of the mortgage loan in between the originator and the MBS/Trust creates a broken chain of title, and if the chain of title is broken, the contract becomes null and void. Because if the homeowner doesn't know who owns the loan, how can he know whom to pay?

**74.** As previously stated, when a Servicer or Trustee like Shellie Wallace is foreclosing, an additional break in the chain occurs as the Trustee is often never the mortgagee of record under a Mortgage Assignment and has absolutely no legal tie to the investors in

20

the MBS. The "Trust" can never hold or transfer a Mortgage in the property on behalf of the investors. The IRS tax-code forbids Trustees or Services from holding any underlying assets in the trust.

**75.** In many of the cases, the originator is no longer in business and/or has been dissolved in bankruptcy. The MBS/Trustee never mentions the intervening transfers to the other parties or the shareholder/investors or to the Court. The MBS/Trustee never proves that such transfers lawfully occurred.

**76.** In the rush to create these trusts and sell shares to investors as fast and in as large a quantity as possible, the loans, Mortgages and Assignments were never prepared, filed or recorded. This means that the entity seeking to foreclose can NEVER prove the chain of ownership.

**77.** The Homeowner has no idea that the bank/Servicer is making payments to, corresponding with and applying for a modification with a mortgage loan servicer instead of a mortgage loan owner or that the Servicer is keeping part or all of proceeds of the mortgage payments without the knowledge or permission of the investors.

**78.** MBS/Trustees and their lawyers discovered in the foreclosure process that the Note and Mortgage Assignments would never be located **because they never existed.** They also discovered that states did not allow blank Assignments or Assignments with retroactive effective dates. To solve the problem of the missing and non-existent Assignments, the MBS/Trustees, their attorneys and their Servicing Agents, decided to fabricate Assignments from thin air and then quietly record the fabricated Assignments. If a Promissory Note Assignment is presented to the Court, it deliberately does not state

the date the Promissory Note was assigned. It was procured after the fact and is based on fraud and in violation of MBS Trusts' tax status requirements. The dateless Promissory Note Assignment or allonge is then affixed to a copy of the Promissory Note because the original Promissory Note simply does not exist. The fabricated Promissory Note Assignments are affixed to Motions for Default or Summary Judgment.

**79.** The Assignments of the Mortgage were signed and notarized many years after the actual date of the loan and the date listed with the SEC and IRS as the "Closing" of the REMIC. In every one of these cases, the MBS Trust has been operating illegally as a tax exempt REMIC. The federal government is in turn, owed billions of dollars in income tax from these entities. The individual states of the union have causes of action on behalf of their citizens for the unpaid state tax.

**80.** Incredibly, most times, the Mortgage Assignments are dated after the filing of the foreclosure. Most foreclosures are filed without an Assignment at all and the Mortgage attached as the Exhibit is in the name of the original lender or a third nominal party like Mortgage Electron Registration Systems, Inc. ("MERS".) The foreclosures are invalid on their face. The recording statutes of every state in the union have been violated.

**81.** In most cases, the Note and Mortgage were severed or bifurcated at the closing table with the Mortgage being recorded in the name of MERS as "nominee" for the original lender. However, the original lender never actually loaned any money to the homeowner. The original lender was never owed or paid any money under the terms of the Note. There the Mortgage sat for years in the name of an entity, MERS, for which the homeowner owed no money and which would never be beneficiary under the Note.

As previously set out, often the MERS held the Mortgage as "nominee" for a lender who was out of business and/or liquidated in bankruptcy. There could be no party legally able to Assign the Mortgage on behalf of the dissolved lender. The only party who could authorize the Mortgage Assignment for a bankrupt lender would be the Bankruptcy Trustee. In these cases where a MERS mortgage has been assigned on behalf of a bankrupt entity, a criminal violation of the bankruptcy code had occurred.

**82.** Citimortgage indicates MERS assigned it the Mortgage. However, an Assignment from MERS was illegal and a nullity. MERS never had an interest in the Note or Mortgage. If MERS was never the title holder, there was nothing to assign.

**83.** If MERS is not the title holder of properties held in its name, the chain of title was been broken, and *no one* has standing to sue or foreclose *(MERS v. Nebraska Department of Banking and Finance S-04-786. No.-- October 21, 2005.)* Any Substitute or Successor Trustee who attempts to sell a property he doesn't have the right to foreclose on is committing fraud.

**84.** Because the Plaintiff has MERS named on his loan, each time the paperwork changed hands, he, the homeowner, should have been notified that someone new held the Note. Instead MERS was used as cover to prevent them from paying court fees once the title changed hands.

**85.** You can endorse the note as many times as you wish...but you have to have a clear chain of title right on the actual Note: For example: I sold the Note to Bill, who sold it to Dave, who sold it to Tommy, and all our notarized signatures are actually, physically, on the Note, one after the other. If for whatever reason any of these signatures is skipped,

then the chain of title is said to be broken. Therefore, legally, the mortgage note is no longer valid. That is, the person who took out the mortgage loan to pay for the house no longer owes the loan based on the fact that was established earlier that if the Homeowner does not know who owns the Note, they do not know whom to pay. The Plaintiff's loan has a "Broken Chain Title," created by MERS.

**86.** Citimortgage's assertion that it has standing to foreclose is based on the supposed assignment of the loan by MERS which would be legally impossible since MERS is a mere nominee.

**87.** Several courts have also acknowledged that: "MERS is not the owner of the underlying Note and therefore could not transfer the Note, the beneficial interest in the deed of trust, or foreclose on the property secured by the deed," citing cases of: In Re Vargas, California Bankruptcy Court; Landmark v. Kesler, Kansas Federal court decision as to lack of authority of MERS; LaSalle Bank v. Lamy, a New York case; and In Re Foreclosure Cases, the "Boyko" decision from Ohio Federal Court.

**88.** If a Mortgage Assignment is dated, notarized and filed in a year after the year set forth in the name of the grantee trust, it was an Assignment fraudulently made for the sole purpose of facilitating an illegal foreclosure or to use as evidence as standing in an action to challenge a homeowner's TILA Rescission. 89. These Specially-Made Assignments have created havoc in the Courts and were done with the specific purpose of perpetrating a fraud on the Court.

**89.** In many cases, the foreclosing entities did not even bother to request that the Specially-Made fabricated Assignment be prepared prior to the filing of the foreclosure.

24

In more cases than not, the Assignments are prepared and filed AFTER the foreclosure action has been initiated. The MBS/Trust (who has no beneficial interest in the loan and probably is not in possession of the original Note) files a foreclosure and then attempts to make it appear to the Court that the MBS/Trust magically knew prior to the Assignment that it would acquire the defaulting property several weeks or months after the foreclosure is filed.

90. Courts have repeatedly asked the MBS/Trustee to explain why they were acquiring non-performing loans and whether such acquisition was a violation of the Trustee's fiduciary duty the beneficiaries under the MBS/Trust. No MBS/Trustee has ever come forth and explained tat MBS/Trust actually listed the loan in its SEC loan list without possessing the loan and that the loan was "acquired" years before the Assignment. As a result, there are many decisions with observations similar to this observation by Judge Arthur M. Schack of Kings County, New York, in *HSBC Bank v. Valentin*, 21 Misc. 3d 1124 [A]: "Further, according to plaintiff's application, the default of defendants Valentin and Ruiz began with the nonpayment of principal and interest due on January 1, 2007. Yet four months later, plaintiff HSCB was willing to take an assignment of the instant non-performing loan, four months in arrears?"

91. In *Deutsche Bank National Trust Co. v. Harris*, Judge Arthur M. Schack, Kings, New York, Index No. 39192/2007 (05 FEB 2008) opined again:

"Further, the Court requires an explanation from an officer of plaintiff DEUTSCHE

BANK as to why, in the middle of our national sub-prime mortgage crisis, DEUTSCHE BANK would purchase a non-performing loan from [bankrupt and now dissolved] INDYMAC...."

92. In cases where the Trust failed to get a valid Assignment, whether before or after the foreclosure, is further complicated by the actual parties participating as Assignors. Most of the major loan originators, listed on the Mortgages or listed as a "nominee" of MERS on the original Promissory Notes, have been sold, closed or dissolved in bankruptcy. These include, but are not limited to; American Home Mortgage, Option One Mortgage, Countrywide Home Loans, and INDYMAC.

93. When these mortgage companies filed for bankruptcy, the Trusts did not claim an interest in the assets (loan lists.) Years later, when Note and Mortgage Assignments were required for the MBS/Trust or Servicer to attempt foreclosure, a bankruptcy Court's permission was needed to assign billions of dollars in Notes and Mortgages. Knowing that permission would not be granted, permission was NEVER sought in any of the aforementioned bankruptcies. Hence, the need arose to invent and forge Affidavits and Assignments on behalf of the bankrupt entities.

94. The similar issue occurs when a Servicer of an MBS/Trust needs to invent an assignment, when the Mortgage is held by the "nominee" MERS. Like the third-party default service companies, the Servicer fabricates and executes the Assignment on behalf of the Mortgagee MERS. A double forgery takes place when the Assignor purports to act on behalf of a non-existent or bankrupt entity.

26

**95.** In lieu of valid Promissory Notes, Mortgages and Mortgage Assignments, MBS/Trusts relied and continue to rely on these fabricated documents produced and executed by their own law firms and third-party default service companies.

**96.** Although the greatest risk of fraud from the fraudulently produced assignments is imposed on the homeowners, this scheme poses a great risk in the exposure of the Title Companies that guaranteed the clear and correct transfer of ownership. Additional risk is imposed on both homeowner and the Title Company due to the fact that the loans were never owned by the MBS/Trust, making the clear and correct transfer of title impossible. The MBS/Trust, Trustee or Servicer has come to the foreclosure asserting standing when it is neither the owner of the underlying debt or the valid Mortgagee.

**97.** Defendants, and other entities such as M&I Bank, Regions Mortgage, Deutsche Bank, U.S. National Bank Association, Bank of America, J.P. Morgan Chase, Wells Fargo, CITI, MERS, and Servicing Agents such as GMAC, Aurora Loan Services, CitiMortgage and Nationstar Mortgage, have administered thousands of foreclosure actions in the State of Tennessee and throughout the United States, including this attempted illegal foreclosure against the Plaintiff , under false pretenses, without the legal authority to do so.

<strong>Unjust Enrichment:</strong>

**98.** The Defendants have illegally executed foreclosure actions against the Plaintiff and intend to acquire monies from the sale of the property while engaging in one or more of the following illegal practices:

**99.** Defendants have filed foreclosure knowing that they were NOT the "owners" or

beneficiaries of the loan they filed foreclosure upon. They knowingly and intentionally set out to deceive the homeowners and Courts as to this fact and had full knowledge of the fact that they lacked Constitutionally defined "Standing" and capacity to foreclose.

**100.** The Defendants and MERS have drafted, executed and filed, or caused to be filed, false and fabricated Promissory Notes, Mortgages, and Assignments of Mortgages, prepared by employees of the foreclosure law firm, in order to fraudulently foreclose upon the Plaintiff's property.

**101.** These MERS Mortgages and Assignments were prepared by an agreement between the Defendants. These Defendants used false information regarding the individuals executing such Mortgages and Assignments, holding such individuals out to be officers of various banks, mortgage companies and mortgage servicing companies and MERS.

## IV. THE CONSPIRATORS' MODUS OPERANDI

**102.** Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of average persons.

**103.** These corrupt influences have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the economic stability of the United States and the world as a whole. This Honorable Court is urged in the strongest possible way to apply a "PRESUMPTION OF FALSITY" when reviewing any documentary evidence filed in this Court by one or more of the Defendants. Such a presumption is not just warranted; it is indeed compelled by the extent to which the Defendants and those with which they are associated have long

acted in a malicious and wanton manner evincing complete contempt for the judicial process and the rights of persons having interests contrary to their own.

**104.** This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic, and legitimate.

**105.** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under the security instrument. This Security Instrument secures to Lender: **(1)** the repayment of the Loan, and all renewals, extensions and modifications of the Note; and **(2)** the performance of Borrower' covenants. There is no "purpose" stated in the preceding sentence. This begs the question as to the following: How can the borrower simultaneously "convey" the property to: (1) MERS as nominee for lender; (2) MERS as nominee for lender's successors and assigns; and (3) MERS's *own* successors and assigns? Furthermore, who are the successors and assigns to an entity with absolutely no interest in the Promissory Note for which the mortgage was allegedly based? No assignment could have existed as of the moment the mortgage was executed by the borrowers, and if somehow same did exist, it should have been disclosed as a fundamental and material aspect of the transaction. If the assignment occurred prior to the mortgage, the mortgage itself is void.

**106.** Because MERS can not assign something it had no rights to in the first place, any and all Mortgage assignment from MERS to a third party are null and void.

29

**107.** By eliminating the physical paperwork, the conspirators did not want there to be any documentation which could later potentially be used as evidence of their crimes. By the use of MERS which uses an "electronic handshake" to transfer mortgages without having to record the transfer in the county where the property is located, they avoided paying the fees associated with recording mortgages, robbing the County clerks across the nation of billions of dollars in statutorily mandated Recording Fees. They did not want to be bothered with the trouble of keeping track of the original Promissory Notes as they have felt at all times that they are above the law. This is the significance of the word 'Electronic' in Mortgage Electronic Registration Systems, Inc. The conspirators, through this exceptionally sophisticated legerdemain, made over the American judicial system's long-honored requirements for mortgages and foreclosures to serve their interests and to minimize the possibilities of the victims obtaining any meaningful redress through the courts.

**108.** They have so far, undermined long-established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements which in all jurisdictions of the United States MUST BE IN WRITING.

### V. STATEMENT OF RELEVANT TENNESSEE LAW AND THE UNIFORM COMMERCIAL CODE

**109.** The alleged Notes in question, started their life as negotiable instruments. They were similar to a check. The negotiation and enforceability of both Notes and checks are governed by Article Three (3) of the Uniform Commercial Code. To enforce a negotiable instrument, a person must be a holder of the note. To meet the definition of a "holder,"

30

the person must possess the note, and the note must be issued or endorsed to him or to his order or to bearer or in blank. The Defendants are not in possession of the original negotiable instrument with any legally binding original endorsement.

**110.** If the Party, at a later date, attempts to claim that the original documentation was somehow "lost," the Note will never be enforceable, as made obvious by official comments to the UCC § 355.3-203, that read as follows: " X signs a document conveying all of X's right, title, and interest in the instrument to Y. Although the document may be effective to give Y a claim to ownership of the instrument, Y is not a person entitled to enforce the instrument until Y obtains "possession" of the instrument. No transfer of the instrument occurs under Section 3-203(a) until it is delivered to Y." the Note and the Mortgage were bifurcated at inception and were and remain unenforceable as a Secured Transaction under the Uniform Commercial Code and Tennessee law.

**111.** There is no assignment of the Promissory Note to the foreclosing Party. Any alleged Affidavits of ownership and Account Status and the Assignment of the Mortgage are believed to be forged instruments. Those forged instruments have been uttered or published into the public record with the County Clerk in order to administer the illegal sale, hence, Mortgage Fraud and Forgery violations have occurred.

**112.** It is asserted that the Law Firm initiating this foreclosure action and the Defendants, have conspired with each other and their other agents and principals to file a false and fraudulent Foreclosure Action and to later create a false and forged Mortgage Assignment.

31

**113.** During the origination of the loan, the Lender, MERS, the Defendants (if it funded the loan and was the "true lender"), and the Title Company conspired together to commit illegal acts pursuant Federal and State law.

**114.** Moreover, the so-called "bogus note" submitted with many Complaints and "Lost Note" affidavits, filed by the thousands present issues of more interest than the basic enforcement of the Uniform Commercial Code. When a Court allows the Foreclosure and or Sale in a contested non-judicial state, based solely on sham pleadings, the entire community is affected as well as the home owner, because the foreclosure was based on forged documents, of entities who did not own the Note, nor did they know the owner.

**115.** In today's environment, in which mortgage notes are freely traded, and serve as collateral for various investment vehicles this "owner of the claim issue" is more important than ever: **(a.)** to determine whether the Note and Mortgage have been bifurcated and issued to separate entities, making neither enforceable; **(b.)** to determine whether a real "holder" or "bearer" of the Note even exists; **(c.)** to determine whether the debt has been paid in a credit default swap (Insurance Policy) a derivative contract, or by the Servicer under a Pooling Agreement; **(d.)** if the Note was in fact "securitized," hence becoming a "Security" it was no longer a Negotiable Instrument/Mortgage Note and is no longer enforceable as a Mortgage Note; **(e.)** to have Mortgages declared void and Titles quieted whenever mortgages have been recorded in the name of the entity MERS.

## VI. NATIONAL HISTORIC BACKGROUND AND SIGNIFICANCE

**116.** In the United States, home purchases are typically financed by mortgages or loans

that are secured by a mortgage (in judicial foreclosure states) or Deed of Trust ( in non-

judicial foreclosure states) and a Note which, when executed on behalf of the same

entity and held by the same entity as a "Note and Deed of Trust", entitle the holder of

the note and deed of trust to foreclose on the property of the borrower if the borrower

is in default without legal excuse or recourse.

**117.** From 2003 through 2008, the Defendants entered into mortgages with

mortgages deeds of trust and notes nationwide that were intentionally separated after

the execution of the mortgage, the note was warehoused and alleged to have been sold

to an investor who literally and actually provided the funds for the loan given to the

borrower, and the note was in whole or in part allegedly conveyed to that investor by

means of deposit in a mortgage backed security pool ("MBS."). In essence, prior to the

contract being signed by the borrower, the note was funded by a party other than the

originator or servicer of the loan. The MBS was literally created and funded prior to the

borrower ever taking out a loan. Therefore, the MBS underwriter/originator or Servicer

had to go create loans after the fact which loosely matched the description of the

prospectus used to entice investors into the MBS. Most times, the ratings Agency, such

as Moody's would give the MBS its AAA rating even thought the loans had yet to be

created or originated.

**118.** Most importantly, for purposes of the nationwide foreclosure frenzy, the investors,

do not attempt to call defaults upon the borrowers nor do the investors threaten to

foreclose or foreclose. The entity filing foreclosure has absolutely NO financial stake in the mortgage loan. If they did, the MBS would lose its REMIC pass through tax status. Most importantly the foreclosing entities have NO agreement with the Trust or Servicer to act on their behalf. In fact, the Pooling and Servicing Agreements forbid the Trustees or Servicers from filing actions on the investors behalf.

**119.** Nationwide, the mortgages and Deed of Trusts, name a party as the "lender" who did not fund the mortgage and had no intention of funding the mortgage; yet, that "lender" who had no beneficial interest named MERS as the beneficiary and MERS had no beneficial interest nor did MERS represent any party to the deed of trust who had a beneficial interest. Each mortgage and deed of trust was, therefore, VOID upon execution because the statements contained therein were untrue and the failure to disclose these facts to the borrower acted to the borrower's detriment and there was no meeting of the minds, no consideration and an utter failure to create a security instrument.

**120.** No party that has initiated foreclosure or intends to initiate foreclosure on any MERS mortgage has any authority to and holds, at most, an unsecured note in favor of the real parties in interest of the note, the investor/owners; if and only if they can prove they have an agency relationship with the owners and if they can show that they owners have not already been made whole by a derivative contract.

**121.** Remember, any alleged Agent cannot foreclose before presenting a contract from the Principal, that allows him or her to foreclose. The Law of Agency stipulates that Agency may not be proven out of the mouth of the Agent, It must be proven out of the

34

mouth of the Principal. Defendants will have to show the Honorable Court that contract

from the Principal.  Regardless of whether the note was sold over and over again in

derivatives, it is the legal duty of the agent attempting to foreclose, to identify who the

Principal is and produce a valid contract from the Principal giving him or her that

authority.  Who is the Principal? Who owns the Note?

**122.** The Note, that had been executed with the mortgages or deed of trust were

separated from the mortgages and deed of trust in that the note became part of a

pool of mortgages; thereby losing its individual identity as a note between a lender and

a borrower. The note instead merged with other unknown notes as a total obligation

due to the investor or investors. The note is no longer a negotiable instrument, but

collateral for a Federally regulated Security under the confines of the SEC.

**123.** The process of a Note becoming a  Security is final and irreversible.  You cannot

unscramble the eggs.  A Security cannot be used to  foreclose.  The Kansas Federal Court

Ruling decided once a note was securitized it was no longer a note and would NEVER be

a note again. It becomes a Security. (Landmark National Bank v. Kesler, 2009 Kan. LEXIS

834.)

**124.** The Servicers, such as CITI, did not fund the loans of the nation's borrowers with

any of their own assets and are not owed any of the funds to be repaid by the nations'

borrowers. The money was put up  by investors. The Servicers do not stand to suffer any

loss should they be enjoined from foreclosing on real estate nationwide and have no

right to foreclose on behalf of unknown investors because of a lack of agency, lack of

authority and lack of knowledge of whether the note has been discharged.

**125.** The entities that have foreclosed or will attempt to give notice that they will foreclose on the homeowner are not the parties that funded the loan of the borrowers. They are Pretender-Lenders.

**VII. CAUSES OF ACTION**
**COUNT I.**
**A. Violation of 18 U.S.C. §1962 [c]**
**The Foreclosing Law Offices**

**126.** Plaintiff re-alleges and affirms each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

**127.** By engaging in a pattern of racketeering activity, specifically "mail or wire fraud," the Defendants subject to this Count participated in a criminal enterprise affecting interstate commerce.

**128.** A separate count of Mail Fraud took place each and every time a fraudulent pleading, Affidavit, Promissory Note Assignment, mortgage or mortgage assignment was sent by a Defendant through the use of the US mail. Likewise is true for any documents sent via electronic mail as would be the case as part of a Federal action electronically filed with the Court. Such would constitute a separate act of wire fraud.

**129.** By sending the fraudulent affidavits, assignments and pleadings to the clerks of court, and Plaintiff in this foreclosure case. These Defendants intentionally participated in a scheme to defraud others, including the Plaintiff. They utilized the U.S. Mail and the internet to do so.

**130.** The criminal enterprise affects interstate commerce in numerous ways. It is used to conceal the true ownership of mortgage loans from the general public, including investors, borrowers, the SEC, the IRS and the Courts.

**131.** But for the Conspiracy, investors would be enabled to have a clearer picture of the assets and debts of large banking and financial institutions in which they may consider investing.

**132.** The entire American economy has been affected by the conspiracy described in this Complaint, which is exemplified by the MERS enterprise. The foreclosure crisis and larger economic downturn were substantially contributed to, and are believed

**133.** to have been caused, by the MERS enterprise and underlying conspiracy as it related to the fraud involved with the securitization of mortgage loans and the issuance of unregulated derivative contracts.

**134.** The "predicate acts" of fraud, which were accomplished through the U.S. Mail, and the internet, and which are specifically attributable to the Defendants subject to this Count, are: **a.)** Administering foreclosure on behalf of entities which were not the real parties in interest, and which had no standing to sue. This involved, and involves, the use of the MERS artifice.

**b.)** Actively concealing the Defendants' lack of standing in their standard affidavits for foreclosure.

c.) The drafting, and processing of the fraudulent affidavits and documents and the subsequent execution of the documents the robo-signers and employees Defendant Law Firm, and the filing of fraudulent and forged affidavits as to loan ownership by

robo-signers and employees of the Defendant Law Firms, servicers and Processing companies.

**135.** By persons working for the foreclosing entity with no knowledge whatsoever of the truth of their contents.

**136.** These predicate acts are related. They share the common purpose of defrauding the Plaintiff and other homeowners. They share the common themes of "non-documentation" and concealment of the real parties in interest.

**137.** The predicate acts satisfy the RICO continuity requirement: they extend from in or

**138.** Beginning in 1998 and continuing unabated, the scheme meets the definition of "open-ended" continuity. The threat of continued criminal activity as part of this enterprise in, without question, still looming over the American economy. Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

**139.** As the result of the RICO enterprise of which these actions were part, the Plaintiff is being defrauded and his home has actually been put up for sale in an illegal foreclosure. The measure of the damages for the Plaintiff is based on how much he stands to lose or would have lost if this fraud were successful based on forged Loan Documents. Since any real parties in interest have already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties at the time of foreclosure is for this reason the measure of the damages to the Plaintiff. To provide an example, if the average value of the property was $241,000.00, which is the case of the Plaintiff, the initial damages to which the Plaintiff is entitled by law would be

38

$241,000.00. This amount is then tripled by operation of the RICO law, so that, without reference to attorney fees and costs, the total damages awarded would therefore be ($241,000.00 X 3 = $723,000), or 723,000 dollars.

**140.** The Plaintiff is entitled to judgment in the amount of three times their actual damages, which should be arrived in the manner indicated in the preceding paragraph. plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c].

### B. Violation of 18 U.S.C. §1962 [c]
### Defendant Merscorp, Inc. and Its Shareholders

**141.** Plaintiff re-alleges and affirms each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

**142.** Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme/RICO enterprise herein complained.

**143.** Its overt acts include the following: **(a.)** Creation of the MERS artifice; **(b.)** Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein; **(c.)** Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue; **(d.)** Drafting of the standard MERS language to be included in such mortgages; **(e.)** Entering into one or more "agreements for signing authority" which purported to allow employees of the other conspirators to execute assignments in which the "assignor" and "assignee" are strawmen actually not possessed of the capacity stated, and of which the person executing the document has no knowledge; **(f.)** Creation and maintenance of an acceptable public image for MERS; **(g.)** Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems, Inc, with the necessary state agencies, plus other ministerial acts

designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature, and; **(h.)** Facilitating the use of the MERS artifice by other participants in the conspirators' scheme.

**143.** These predicate acts are related. They share a common purpose, defrauding the Plaintiff of his money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

**144.** The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closedended" continuity.

**145.** As the result of the RICO enterprise of which these actions were part, the Plaintiff faces losing his home which is being sold by the Defendants' attorneys. The MERS mortgages were and are not enforceable. The mortgage loan possessed by the Plaintiff was not subject to being foreclosed upon, and the mortgage amount recorded in the pubic record of the properties is the measure of the damages in relation to MERS. The manner in which damages should be calculated is set forth in Count I.A. and is incorporated here by reference.

### C. Violation of 18 U.S.C. §1962[d].
### All Named Defendants

**146.** Plaintiffs re-allege and affirm each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

40

**147.** The Defendants have conspired together to violate 18 U.S.C. §1962[d], by committing fraud and utilizing the US Mail. The Defendants agreed upon the same criminal objective to wit: the theft of real property through illegal foreclosures. Each conspirator is reasonable for the actions of the others and the results of the conspiracy as a whole.

**148.** Those who provide support for an illegal enterprise are liable for the actions of those who commit the criminal acts, regardless of whether they participated in that particular criminal act.

**149.** Additionally, each and every shareholder in MERS shall so too be responsible for the acts of the other players to the conspiracy.

**150.** The Plaintiff is entitled to judgment in the amount of three times the actual damages, plus costs and attorneys' fees under 18 U.S.C. §1964[c].

<u>COUNT II.</u>
<u>Conspiracy</u>

151. Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

<u>Introduction of the Claim:</u>

**152.** At all times relevant hereto, agreements were made by and between the original Lender the foreclosure Plaintiff and MERS to deceive the Homeowner; and to break Tennessee and Federal law. The entities colluded together to achieve unlawful aims by unlawful means. The entities, as co-conspirators, took overt steps to accomplish their illegal acts and have clearly demonstrated their intention to break the law; thereby "breathing together" in their fraudulent and illegal acts.

41

**153.** Defendant Citimortgage using the foreclosure attorney, seek to undermine and eventually eviscerate long-standing principles of real property law, such as the requirement that any person or entity who seeks to foreclose upon a parcel of real property: 1) be in possession of the original Note and mortgage and 2) possess a written assignment giving he, she or it actual rights to the payments due from the borrower pursuant to the mortgage and note.

**154.** Conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this Complaint the evidence of which has also been recorded at the Wilson County Clerks office for the illegal foreclosure sale.

<u>**The Use of the term "nominee":**</u>

**155.** On the Plaintiff's mortgage, MERS calls itself the "nominee" for the lender listed on the Promissory Note. However, this allows for another "nominee;" one which could apparently coexist with MERS.

**156.** When the Note has been table funded, meaning the lender on the Note never lent any money and therefore never had any rights in the Note, MERS has become the "nominee" for an entity with absolutely no pecuniary interest in the Note from the moment of Note's execution.

**157.** The Mortgage states that MERS "is" the nominee for the lender. "IS" is present tense - - this seems to indicate that as of the time of execution of the mortgage, MERS was performing some unknown service for both lender and its "successors and assigns" even though ostensibly the mortgage had not as of execution been assigned. Upon assignment, it would seem to be impossible for MERS to act as "nominee" for the

42

original lender. This phrase also tacitly acknowledges that the mortgage will be assigned.

**158.** A "mortgagee" is the person or business making a loan that is secured by the real property of the person (mortgagor) who owes him/her/it money.

**159.** In order to further the goals of the conspiracy, and to perpetuate this new paradigm was the inclusion in new mortgages of intentionally ambiguous and infinitely malleable provisions pertaining to MERS. As is the case with most of the written documents

**160.** As routinely used in the scheme, with mortgage assignments and complaints for foreclosure, each word concerning MERS in these standardized mortgages is carefully crafted so as to allow those relying upon it to infinitely recede in their positions and to be moving targets virtually unreachable by standard legal means.

### The false "Transfer" of Rights in the Property:

**161.** This Security Instrument secures to Lender: **(i)** the repayment of the Loan, and all renewals, extensions and modifications of the Note; and **(ii)** the performance of Borrower's covenants. There is no "purpose" stated in the preceding sentence.

**162.** How can the borrower simultaneously "convey" the property to: (1) MERS as nominee

**163.** for lender; (2) MERS as nominee for lender's successors and assigns; and(3) MERS's *own* successors and assigns? Furthermore, who *are* such successors and assigns? No assignment could have existed as of the moment the mortgage was executed by the borrowers, and if somehow it did exist, it should have been disclosed as a fundamental

43

and material aspect of the transaction. If the assignment occurred prior to the mortgage, the mortgage itself is void because the lender had no interest to secure.

**164.** A mortgage is not a conveyance of property by operation of state law.

**165.** What "interests" does this passage refer to, and to *whom* were they granted? No "law or custom" could possibly necessitate action by MERS, as opposed to action by the original lender.

**166.** Before the ink on the new mortgages was dry, and before the loan would be considered "dry" by industry standards; while the loan was still "wet" and in many cases non-existent legally, the lenders promptly sold the loans, in secretive transactions, to "investors" for some percentage or fraction of what had been the alleged value of the mortgage and the property by which it was secured just days or weeks earlier. In some cases, the loan was listed inside a MBS and sold before the loan was even consummated. Most were sold without the Note ever being in the possession of the MBS. All loans, for purposes of this Complaint, were securitized and sold with the mortgage recorded in the name of MERS. The unsuspecting investors were in fact buying nothing. The Mortgage-Backed Securities weren't in fact mortgage backed.

**167.** The quick sale by the lender of its interest, at what appears to be a loss, would have at first seemed inexplicable, but when considered with the benefit of hindsight, proof of these quick transfers would have been evidence that the lender knew in advance that property values would soon decline. Additionally, the securitizers/underwriters, hedged their bets beforehand with multiple collateral

44

contracts, far in excess of their original investment, thereby banking on and benefiting on the fact that the MBS would eventually fail.

<u>**Concealed Identity:**</u>

**168.** The bankers behind the scenes cooperated in obscuring the truth as to who had the right to receive the proceeds of the loans, and to foreclose in the event of non-payment. The loans were grouped into "pools" and sold multiple times, thereby increasing profits for the wrongdoers. These "securitized debt pools" were sold on the stock market and elsewhere, and in this manner affected interstate commerce. The real parties in interest also in many instances collected mortgage insurance upon "default."

**169.** Another part of the scheme was the use of words in ways inconsistent with their traditional meanings, and the creation of new terms which could be used to blur important distinctions between parties and their interests. The revolutionary ways in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower. For example, "mortgagee" began to have a meaning other than "lender." "Servicer" arose to prominence and was and is used to further obscure important truths. Specifically, the "servicer" does not hold the true beneficial interest in the mortgage.

**170.** Typically, the Defendants will not release any further information on the subject, whether it is requested in discovery in a foreclosure action or in any other context.

**171.** With the oversight of Defendant MERS/Merscorp and its yet to be named unknown principals, the MERS artifice and enterprise evolved into an "ultrafictitious" entity. To

perpetuate the scheme, MERS was and is used in a way so that to the average consumer, or even legal professional, can never determine who or what was or is ultimately receiving the benefits of any mortgage payments. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

**172.** In addition to the other incriminating facts set forth in this Complaint the Honorable Judge in this case may also consider this: On its website, **www.mersinc.org,** Defendant MERS/Merscorp lists the shareholders of "MERS," which is defined on a separate page of the site as "Mortgage Electronic Registration Systems, Inc." Among the shareholders of MERS, according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo. These are many of the same institutions the law firm in this action represents. This is no coincidence, as these entities are co-conspirators in the MERS scheme herein described.

**173.** The conspirators of course did not want there to be any documentation which could incriminate them or later potentially be used as evidence of their crimes and evidence to the investors of the MBS or the IRS that the loans were illegitimate.

**174.** They did not want to pay County Clerks the fees associated with recording mortgages and they did not want to be bothered with the trouble of keeping track of the originals. That is the significance of the word 'Electronic' in Mortgage Electronic Registration Systems, Inc.

46

**175.** The preparation and filing of MERS mortgages and assignments, and prosecution of the complaints to Foreclose on the MERS mortgages on these properties were each predicate acts in the pattern of racketeering activity complained of herein, and were actions taken in furtherance of the MERS enterprise. The actions could not have been brought by the Defendant Law Firm without the MERS artifice and the ability to generate any necessary "assignment" which flowed from it. Just like MERS, the assignments were meaningless shells designed to pull the wool over the eyes of the judiciary and ease the burden upon the unknown real parties in interest. The practice of "non-documentation" can be seen as a common thread weaving all of the complained-of conduct into an undeniable tapestry of a criminal enterprise proscribed in the Texas statute.

<u>**COUNT III.**</u>
<u>**Violation of Tennessee Code Title §39-14-114. - Filing Illegal Liens**</u>

**176.** Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

**177.** A person may not make, present, or use a document or other record with knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property. A person is guilty of filing an illegal lien when he files a document or lien that he knows or should have known was forged, groundless, contained a material misstatement, or was a false claim.

47

**178.** The Defendants have filed forged, groundless, materially misstated or false claims against the Plaintiff's property in the way of illegal Assignments of Mortgages. The individuals responsible for the violations, can be ascertained from the public record for criminal prosecution. Restitution to the Plaintiff is warranted.

**179.** All parties taking part in or who conspired with those who participated in the acts or practices in question are jointly and severally liable to the Plaintiff.

## COUNT IV.
## Common Law /Statutory Fraud and Injurious Falsehood

**180.** Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

### Fraud:
### Tennessee Code Annotated, TCA §39-14-105.

**181.** In a real estate transaction this occurs when a party makes a false representation of fact or a false promise to induce the plaintiff to enter into an agreement, the plaintiff relies on the false promise by entering into the agreement, and the reliance causes injury to the plaintiff. The presence of fraud in a contractual proceeding makes the contract voidable by the party upon whom the fraud was perpetrated. Fraud occurs generally where there is an intentional deception made for personal gain or to damage another. For a civil verses a criminal claim under contract law, there are six elements: 1) a "material misrepresentation;" 2) "which is false;" 3) which Defendant knew "to be false or made recklessly;" 4) which was made in order to induce Plaintiff to act in a certain manner; 5) that Plaintiff so acted in reliance on the misrepresentation; and, 6) that Plaintiff was injured as a result of this reliance.

48

**182.** The forged and publicly filed "false" foreclosure affidavits are the key element to the Defendants being able to perpetrate the fraudulent foreclosures. The Defendants conspired together and "knew" the "material representations were "false." The material representations to the County Clerk and the property owner, were made so that the Courts and the property owner would believe that the Defendants had legitimate claims in the property. The property owner and Judge rely on such and the property owner is being injured as a result with the facing of this foreclosure. There could possibly be no more serious injury to a homeowner than the illegal divestment of his private property.

### Injurious Falsehood:

**183.** One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

**184.** The Mortgage documents were published false statements intended to do harm in which the Defendants clearly recognized would divest the property owner to title. The Defendants knew the foreclosures affidavits were filed with false statements as to the Defendants' standing and status as Mortgagee.

### Count V.
### Slander/Defamation of Title and Quiet Title

**185.** Plaintiffs incorporate each and every paragraph of this Complaint as if fully set forth in this claim.

**186.** Based on this Petition in Equity, the property owner is entitled to have clear title

49

restored and the Honorable Court should release the mortgage and strike mortgage assignments filed in the name of the Defendants.

## Slander of Title:

**187.** The Defendants have knowingly and maliciously communicated, in writing, a false statement which has the effect of disparaging the plaintiff's title to property.

**188.** MERS was illegally and fraudulently listed in the public record as a Mortgagee, having no pecuniary interest in said property and no standing to ever collect upon or enforce a debt connected to the property.

**189.** Plaintiff is the rightful owner of the property known as has stated herein above.

**190.** The Plaintiff is the legal title holder of the property.

**191.** MERS has caused to be recorded against the title of the Plaintiff's property and sent notices of default, filed foreclosure affidavits and documents that claim an interest in the property of the Plaintiff.

**192.** As alleged herein, any purported transfer of any interest in the Plaintiff's real estate was wrongful and invalid because the mortgage, foreclosure or purported foreclosure was invalid and was not conducted in accordance with the laws of Tennessee. MERS knew or should have known that such transfers were wrongful and invalid. Any publication of an ownership interest in any of the Plaintiff's properties is, therefore false.

**193.** The recording of the mortgage published the information to third parties.

**194.** As a result of said wrongful publication of an ownership interest in the Plaintiff's property, Plaintiff has incurred damages in excess of the amount of the individual

publicly recorded mortgage and will continue to incur fees and costs related to this suit, in an amount to be proven at trial.

**(Declaratory Relief)**

**196.** As alleged in Plaintiff's claims regarding Defendants' wrongful filing of mortgages, foreclosure, unjust enrichment and conspiracy, Plaintiff's rights have been violated.

**197.** Defendants have filed mortgages, threatened foreclosure and are now selling the Plaintiff's house at a public auction, for which Defendants are not owed any payments, have no lawful right to foreclose and have unlawfully deprived or attempted to deprive Plaintiff of their home and further have failed to notify the Plaintiff of the discharge of his obligations on the notes associated with his mortgage.

**198.** Plaintiff seeks a declaratory judgment against Defendants stating that Defendants have violated Plaintiff's rights and that the Defendants had and have no right to hold mortgages in the name of MERS and/or foreclose on the Plaintiff's property and that the Defendants are entitled to no further payments from the Plaintiff or recognition in Plaintiff's Title to their property.

**(Reformation)**

**199.** Plaintiff has been intentionally misled about the terms and conditions of the agreements entered into with the Defendants, MERS and all other yet to be named lenders, who originated loans or who have attempted to foreclose on the Plaintiff.

**200.** The Plaintiff is entitled to a reformation of these agreements and note as an unsecured note or as partially or wholly a discharged note and a right to reformation of

the contracts with the persons or entities who are owed obligations because of funding of the loans of the Plaintiff.

**(Quiet Title)**

**201.** The Plaintiff is entitled to have his property as referred to herein quieted in his names until and unless some party comes forward during this litigation who has a right to enforce the loans upon the house free and clear of all encumbrances.

**202.** The originators of the loans were brokers of loans and intended to place the loans but to never be the "lenders" that they purported to be.

**203.** The originators of the loans, were, in fact, a means by which MERS and the Defendants could insulate themselves from liability for the breach of contract, the violation of lending and recording laws, and for all the reasons stated in the allegations of this Complaint.

**204.** The Defendants have not loaned any money to the Plaintiff.

**205.** The Defendants have no contractual relationship with the Plaintiff.

**206.** The Defendants are not the holders in due course of the promissory notes on the Plaintiff's property.

**207.** No one who has an interest in the Plaintiff's property has made any claim of that interest.

**208.** The Plaintiff is entitled to have the title to the property quieted in his names as to the Defendants, where a mortgage was ever recorded in the name of MERS.

52

## Count VI.
### Fraud by Misrepresentation

**209.** Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

**210.** The deceptive acts of CitiMortgage, the original Lender(s), and MERS as to the inducement of the borrower to enter the transaction and as to a multitude of misrepresentations in the execution of such; including, but not limited to the true identity of the Lender and fraudulent misrepresentation as to the Mortgagee, MERS. the parties in question are jointly and severally liable for their acts of fraud by their misrepresentation and all damages stemming from such, including punitive damages and court fees.

## Count VII.
### Fraud by Omission and Inducement

**211.** Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

**212.** The Lender conspired to fraudulently conceal the "True Lender" at closing, and the Note may have been securitized and converted into an investment vehicle within a Special Purpose Vehicle. The parties had a duty to disclose the true nature of their relationship and the fact that the Lender was merely a "Pretender Lender" and thus, the agent for the Concealed and Unknown Lender. The failure to disclose the material facts, induced the Defendants to enter into a loan with unknown and unrevealed entities. The Lender and MERS are jointly and severally liable for their acts of Fraud by Omission and all damages stemming from such.

53

## COUNT VIII.
### Conspiracy to Commit Fraud by the Creation, Operation and Use of MERS System

**213.** Plaintiff incorporates by this reference and re-alleges the allegations contained in all the paragraphs above as if set forth fully herein.

**214.** Upon information and belief, the Defendant conspirators are or have been members of and participants in the MERS system, and, through their employees and agents, served as members of MERSCORP, Inc. and/or MERS, Inc., and participated in the design and coordination of the MERS system described in this complaint.

**215.** Defendants' participation as shareholders, directors, operators, or members of MERSCORP, Inc. and/or MERS, Inc. are as follows:

**216.** MERSCORP, Inc. is the operating company that owns and operates the MERS System described herein, and is the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS, Inc.").

**217.** Beginning at a time unknown to the Plaintiff, prior to 2004, and continuing through at least the present, the Defendant co-conspirators engaged in a conspiracy to unlawfully deprive borrower-homeowners of property in numerous States through issuing predatory loans as described herein, and through securitization and subsequent processes described herein.

**218.** Defendant conspirators intentionally created, managed, operated and controlled the MERS system with the unlawful intent and for the unlawful purpose of making it difficult or impossible for homeowners and other victims of such industry-wide predatory policies and practices to identify and hold responsible the persons and

54

entities responsible for the unlawful actions of Defendants and their co-conspirators because MERS did not track the transfers but relied upon the members to report the transfers when a foreclosure was initiated.

219. Removing the transfers from the recording process and failure to record a real estate transaction on the public record maintained by the county clerks prevents oversight of real estate transactions by the public and by public officials. With the recording of the security instrument(s), MERS becomes the mortgagee in the county land records and no assignments are required during a subsequent sale and transfer of the loan between MERS members.

220. Upon information and belief, the intent and purpose of the Defendant conspirators and their co-conspirators in the creation, management, operation and control of MERS was, without limitation, to make it impossible for the borrowers, their attorneys, the courts, the government, and anyone other than the Defendant conspirators who created and controlled MERS to identify the actual beneficial owner of any particular loan or the property which was the collateral securing that loan until such time, if any, that foreclosure action was initiated. As a result, Plaintiff was deprived of the right to modify the toxic loan even though CitiMortgage did not provide the right to modify the loan and the true beneficial owners were intentionally hidden from Plaintiff and the transfers that occurred of the Note of the Plaintiff have also been hidden from them.

221. The MERSCORP, Inc. rules and by-laws, to which MERS Members agree, cannot be carried out lawfully because they require the following:

55

**a.** MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.

**b.** The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the Mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as Mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law. . . .

MERS and the Member agree that: **(i)** the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans, **(ii)** transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the

mortgage loans, and **(iii)** membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System."

The times, dates, and locations of the various meetings and communications among and between the conspirators are solely within the knowledge of the conspirators and have not been made public by MERS or its co-conspirators.

**222.** A securitization process that was based on loans that were made based on residential loan underwriting guidelines that were designed to generate as many loans as possible to fuel the securitization process to feed the demand for mortgage-backed securities, the faulty and toxic nature of which loans was hidden by the MERS system. As a result of MERS being named the beneficiary, and through the processes described herein, the Note and deed of trust are "SPLIT." When the Note is split from the deed of trust, then the Note becomes unsecured and a person holding only the Note lacks the power to foreclose and a person holding only a deed of trust suffers no default because only the holder of the Note is entitled to payment on it. The monetary effect of utilizing the MERS system, in addition to the allegations set forth otherwise herein, was to hide profits and fees that were not disclosed to the borrower or to the investor in the note, which, in some cases, upon information and belief, were in excess of the principal value stated on the Note.

**223.** All Defendants named herein as co-conspirators profited from their respective roles in originating loans, selling them, and pooling their MERS registered home loans together in large bundles which were sold and turned into financial derivative

instruments.

**224.** The mortgage securitization process became known in financial industry parlance as "slicing and dicing." The slicing and dicing results in a pool of mortgages which have lost their individual characteristics but which have a high value to those who create them.

**225.** The Defendant described herein as Trustee have and will attempt to unlawfully foreclose on the homeowner property. The Servicers or trustees will misrepresent the legal right to foreclose, when, in fact, they have no right to foreclose. The wrongful foreclosure will illegally deprive the Plaintiff of the legal title to his home if allowed to proceed;

**226.** All Defendants named as MERS members agreed to promote MERS, an ostensibly lawful business, and to utilize MERS in an unlawful manner to deprive Plaintiff and those similarly situated of property.

**227.** The securitization process took distinct loans, deeds of trust, and mortgages, and pooled them together in such a manner that they lost their unique identity. Hundreds of such financial derivative instruments were created by the co-conspirators. The co-conspirators all profited from their respective roles in the process, including, but not limited to, the following pooling agreements. These pooling agreements are examples of the type of pooling agreements utilized by the Defendants:

**229.** Upon information and belief, Plaintiff's loan was securitized, "sliced and diced" and pooled into mortgage pools such as the ones described herein as part of the conspiracy related to the creation and operation of the MERS system, and Defendants, and each of

58

them, profited from same and are liable for their acts and the acts of their co-conspirators in creating the MERS system, including, but not limited to, the use of MERS-approved and created documents to establish the loans (including, but not limited to, the form of deed of trust), and in participating in the securitization process described herein, thus, involving the Plaintiffs in this fraud upon the investors without their knowledge.

**230.** Upon information and belief, Defendant conspirators utilized funds received as part of the Troubled Asset Relief Program (TARP) payouts and payouts from the Federal Reserve or the FDIC to further the conspiracy to defraud Plaintiff to deprive him of his money, to deprive him of his property and any equity in his property, to unlawfully initiate foreclosure on his house and, by that foreclosure, ruin their Credit and Credit Rating and standing in the community, to pay investors in the mortgage-backed securities which were comprised of the loan made to Plaintiff and others similarly situated, and to pay bonuses to employees and officers of the Defendant conspirators based on their devising the subprime mortgage-backed products which were securitized by loans of the type issued to Plaintiffs, and collateralizing and selling such products in the United States and abroad.

**231.** As a result of Defendant conspirators' conspiracy described herein, Plaintiff has suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation, loss of reputation and a decreased Credit Rating which has, or will, impair Plaintiff's ability to obtain Credit at a more favorable rate than before the decrease in

Credit Rating, the loss or anticipated loss of their Residence and other financial losses the Plaintiffs is incurring in this matter.

**232.** Defendant conspirators' actions were wanton, willful and reckless, and justify an award of punitive damages against Defendant conspirators, and each of them.

**COUNT IX.**
**Conspiracy to Commit Wrongful Foreclosure by the Creation, Operation and Use of the MERS System**

**233.** Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

**234.** Upon information and belief, Defendants and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from wrongful foreclosures perpetrated on Plaintiffs as alleged herein.

**235.** Specifically, the MERS system was designed to remove the need for recordation of transfers of deeds of trust as alleged herein. This component of the design of the MERS System facilitated the wrongful foreclosures complained of herein by making it easier to transfer.

**236.** The MERS system does not track the transfer of the notes nor to what entity the notes were transferred.

**237.** The MERS system does not track the identity of the holders of the Note on the Plaintiff's properties.

**238.** The illegal use of the Mail, and the internet and which are specifically attributable to the Defendants subject to this Count, are:

60

**239.** Foreclosure on behalf of entities which were not the real parties in interest, and which had no standing to foreclose. This involved, and involves, the use of the MERS artifice.

**240.** Actively concealing the Trustee's lack of standing in their standard complaints for foreclosure, usually entitled, "Complaint to Foreclose Mortgage and to Enforce Lost Loan Documents." It is believed that in 80% or more of these mortgages held and foreclosure complaints filed by the Defendants, the original loan documents do not exist.

**241.** Although MERS is the mortgagee of record, it has never been the "owner" or "holder" of the Note. Most importantly, MERS is never the agent of the actual holder in due course or the owner of the Note. MERS works for the servicing agent, which, as with MERS, is not the holder in due course or the owner of the Note. MERS never has a relationship with the owners of the Note.

**242.** As the result of the enterprise of which these actions were part, the Plaintiff has suffered damages, in that he has been making mortgage payments to a servicing entity not entitled to the proceeds of the Note. Plaintiff also has the title to his property clouded by the listing of MERS as mortgagee in the public record.

**243.** Since the real parties in interest are not parties to the foreclosures or Mortgagees of record, the mortgages were truly not subject to being foreclosed upon.

**244.** Since the real parties in interest are not parties to the foreclosures or Mortgagees of record, the mortgages were truly not subject to being foreclosed upon. MERS admittedly does not hold any promissory notes because it uses an electronic registration

system. A party must have possession of a promissory note in order to have standing to enforce and/or otherwise collect a debt that is owed to another party. Given these facts, MERS does not have legal standing to enforce or collect on the mortgage loans that are supposedly secured by mortgages which name MERS as a "nominee".

**245.** Plaintiff is entitled to judgment in the amount of three times their actual damages, plus court costs under 18 U.S.C.§1964[c],

**COUNT XI.**
**Unjust Enrichment**

**246.** Plaintiff incorporates each and every paragraph of this Complaint as if fully set forth in this claim.

**247.** Defendants' deceptive scheme as alleged herein will unjustly enrich Defendants, and each of them, to the detriment of Plaintiff, by causing Defendants, and each of them, to receive monetary payments from the mortgage payments, and/or the sale of Plaintiff's properties through illegal foreclosures. The Defendants were not entitled to the mortgage payments or proceeds of a foreclosure. The Defendants did not fund the loans of the Plaintiff.

**(Irreparable Harm)**

**248.** The Plaintiff will suffer irreparable injury unless the foreclosure sale is restrained and enjoined, and will lose his cash and personal investment in the home and right to peaceful enjoyment with his wife and two children their home.  Plaintiff is a Country music producer and artist and has  converted his home  into a recording studio which is his workplace since he is self-employed.  Loss of his home by the illegal foreclosure would create great financial hardship for the Plaintiff,  since he depends on the work he

creates from the home studio for a livelihood. Additionally, the Plaintiff will lose the right to sell or mortgage the property at some future date and will not obtain full benefit of the appreciated value.

**COUNT X.**
**VIOLATION of RESPA Sections 8(a) and (b).**

**249.** At closing, Plaintiff was charged fraudulent closing fees on his HUD-1 Settlement statement yet the lender is only allowed to charge the borrower those fees the borrower would have to pay, if they purchased the house in cash, and those fees the lender must pay to a third party vendor.

**250.** However, at closing, the vendor didn't provide Plaintiff any documentation **(a)** to show that first the fees were proper; **(b)** that they were allowed by law; **(c)** that the services provided by the vendor were necessary; **(d)** that the amounts charged were reasonable; **(e)** neither did the vendor show the Plaintiff his disbursement to prove that he didn't take any unauthorized markup on the amounts charged. Because no documentation was provided, these fees were all bogus. These false and fraudulent fees violated the Real Estate Settlement Procedures Act.

**251.** Bottom line**,** the lender added these fraudulent fees in there, because it was intended that all of these costs, be absorbed in the interest rate that they charge – part of the Finance charge. Furthermore, they added them to the head of the Note, charged interest for 30 years, and they took those amounts and slipped them under the table to the Loan Originator. So now you as a homeowner are paying on fees that have already been artificially inflated.

**252.** First, Section 8(a) of RESPA prohibits the transfer of a thing of value pursuant to an understanding that business will be referred to any person. **(a)** No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person. 12 U.S.C. Sec. 2607(a).

**(b)** No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. 12 U.S.C. Sec. 2706(b).

**253.** On closing, Plaintiff also wasn't told that the loan would be sold over and over again as a Mortgage Backed Security through MERS. Lender failed to adhere to the Truth In Lending Act amendment requiring that when a loan is sold, the new owner of the loan must notify the borrower. Again, this arises under 15 U.S.C. 1641 et seq.

**254.** Borrowers deserve to know when their loans are being passed around like Whiskey bottles at a Frat house on the secondary loan market.

## COUNT XI
### Violation Of Federal Debt Collection Practices Act 15 USC § 1692g

**255.** Defendant Law Firm made contact with the Plaintiff and identified themselves as a "Debt Collector" for lender. Plaintiff disputed the amount that he allegedly owed and asked the Defendant Law Firm to validate the debt, which they refused to do because they don't believe Federal Law applies to them.

**256.** Federal law stipulates that a debt be verified as required by FDCPA pursuant to 15 USC § 1692g. The following required documentation is what constitutes legal validation of a debt under Federal law:

- Complete payment history, the requirement of which has been established via Spears v Brennan 745 N.E.2d 862; 2001 Ind. App. LEXIS 509 **and** Original Agreement (Wet-ink Note) that bears the signature of the alleged debtor wherein he agreed to pay the Original creditor.

- Letter of assignment from the Original creditor to the debt collector. (Agreement with debt collector's client (the Principal) that grants them the authority to collect on this debt.) Coppola v. Arrow Financial Services, 302CV577, 2002 WL 32173704(D.Conn., Oct. 29, 2002) Who is the Principal? Who owns the Note?

**257.** Furthermore, under FDCPA Section 809 (b), a debt collector is not allowed to pursue collection activity until the debt is FULLY validated. This would mean that the foreclosure sale would have to be suspended until the debt is validated.

**258.** The debt collector was asked by Plaintiff to validate the debt the same day they identified themselves as a debt collector but refused to adhere to Federal law.

**259.** Verification of the alleged debt is crucial because the True, Real and Actual Beneficiary of the Note must be correctly identified in order to get paid. The rationale is to protect the obligor from being subject to multiple demands for payment on a single Note.

65

**260.** An English case law and the history of property rights Sheldon v. Hently, a 1680 case said: *"An indebted merchant owed his debt to the person who had lent him the money, not to a debt collector who came around bearing a note."*

English case law is still valid in America since the U.S. is heir to the tradition of common law from English law.

## VIII. CONCLUSION

**261.** Upon information and belief, the Defendants, did not and cannot legally obtain foreclosures and/or file an Assignment of the Notes or Mortgages of the Plaintiff. Neither the Defendants nor MERS have capacity or standing to file suit or foreclose on property. (U.S. Bank N.A. v. Ibanez and Wells Fargo Bank NA v. LaRace et al, Supreme Judicial Court of Massachusetts, No. SJC-10694.) The lower-court cases are U.S. Bank National Association v. Ibanez, 08-Misc-384283, and Wells Fargo Bank NA v. LaRace, 08-Misc-386755, Commonwealth of Massachusetts, Trial Court, Land Court Department.

In conspiracy with each other, the Defendants, filed fraudulent mortgages, affidavits, and mortgage assignments, filed sham foreclosure documents and committed and continue to commit fraud on the recording clerks and the Courts.

**262.** These violations as aforementioned entitle the Plaintiff to recover the actual damages they have sustained as a result of the improper filing of foreclosure affidavits and the improper filing of the Mortgage Assignments; statutory damages as permitted by law; restitution under for the violations of the criminal acts, treble damages as allowed by the acts, punitive damages, and cost and attorneys fees incurred. The

Plaintiff is entitled to equitable relief as to the clearing and Quieting of the Title to his property in relation to the filing of false Note and Mortgage Assignments.

**263.** The facts presented in this Complaint show that MERS is not the owner of the underlying note and therefore could not transfer the note, the beneficial interest in the deed of trust, or foreclose on the property secured by the deed," as established in Landmark v. Kesler, Kansas decision as to lack of authority of MERS; LaSalle Bank v. Lamy, a New York case; and In Re Foreclosure Cases, the "Boyko" decision from Ohio Federal Court.

**264.** Because the Successor Trustee attempting to foreclose on the property, has failed to produce documentation to prove that the loan got into the Trust, (i.e Receipts and Certifications) that will verify this loan is listed as an asset in that Trust, she has failed to prove that the Trust she is Trustee over is legitimate and has standing to foreclose. If the loan NEVER made it in the Trust, how can a Trustee enforce that which does not exist in the Trust?

**265.** Because ALL of the Defendants including the debt collector have failed to present any evidence or proof to the Plaintiff upon request in writing for verification of possession of the Note, for the disputed debt, none of them is a holder in due course. (Norwood v. Chase Home Finance LLC, 1:09-cv-00940-JRN, W.D. Tex, Jan 19, 2011).

### EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER

**266.** The Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

**267.** The purpose of a temporary restraining order is to preserve the status quo — the

67

last peaceable, non-contested status that preceded the controversy. The issuance of the restraining order will preserve the status quo in this matter. Furthermore, Plaintiff will suffer immediate irreparable injury if Defendants are allowed to continue with the foreclosure sale of Plaintiff's homestead.

**Irreparable injury justifying temporary restraining order**

Plaintiff respectfully requests that this Honorable Court a temporary restraining order be issued without notice to the Defendants, restraining the defendants, their agents, servants, and employees, from directly or indirectly selling or attempting to sell the trust property on March 30, 2011, under the power of sale contained in the deed of trust.

**(i)** The Plaintiff will suffer irreparable injury unless the foreclosure sale is restrained and enjoined, and will lose his cash and personal investment in the home and right to peaceful enjoyment of with his wife and two children their home.

**(ii)** Plaintiff is a Country music producer and artist and has converted his home into a recording studio which is his workplace since he is self-employed.

**(iii)** Loss of his home by the illegal foreclosure would create great financial hardship for the Plaintiff, since he depends on the work he creates from the home studio for a livelihood.

**(iv)** Additionally, the Plaintiff will lose the right to sell or mortgage the property at some future date and will not obtain full benefit of the appreciated value.

**(v)** The Plaintiff will also be unable to comply with his contractual obligations requiring him to compose, arrange, produce and record music from his studio for clients.

**Inadequate Remedy at Law**

(a) In addition to injuries that cannot be remedied by any award or damages, the Plaintiff will be unable to take actions to protect the interests of his clients who use his expertise and equipment and will be in danger of being under breach of contract and breach of trust for not delivering the finished product to the clients he is currently producing. The home also hold sentimental value to the Plaintiff.

(b) There is no remedy at law that is clear and adequate to protect the Plaintiff's property interest against this wrongful foreclosure by the Defendants. The Plaintiff respectfully requests injunctive relief so that justice may be done, not merely for delay. The issuance of the restraining order will preserve the status quo in this matter— the last peaceable, non-contested status that preceded the controversy.

## MOTION FOR PRODUCTION OF DOCUMENTS

**268.** The Plaintiff prays that at the hearing the Honorable Court require the Substitute Trustee and the Defendants to present the following documents to the Court:

(i) The Original Blue-ink Note and the Title for inspection by Plaintiff and the Court.

(ii) Certification (**C-1**) from the Trust that the Note was conveyed and delivered to the Trust and they received all the ORIGINAL instruments that verify this loan is listed as an asset in that Trust over which Successor Trustee Shellie Wallace manages.

(iii) Certification BY the Trust that they received what they were supposed to receive, and the documents complied with the requirements of the Trust. (Certificate **C-2**)

(iv) Copies of **Form-1066** that are required to be filed annually with the **IRS** to prove that the Trust is still functional. (For Tax Yrs, **2008, 2009** and **2010**). Please avail these forms.

69

(iv) An agreement between the Trust and Substitute Trustee that acknowledges a Trust was indeed set up and that the Trust meets all the obligations for the physical delivery of the instruments and appoints Shellie Wallace as the Substitute Trustee for the Trust.

(v) The Original contract between the Substitute Trustee attempting to foreclose and the Principal (Owner of the Note) that grants the Substitute Trustee the right to act on their behalf, including administering foreclosure. This is part of the Debt Verification requirement of the FDCPA pursuant to 15 USC § 1692g (Coppola v. Arrow Financial Services, 302CV577, 2002 WL 32173704(D.Conn., Oct. 29, 2002)(v)

 (vi) The Original Transfer of assignment of the Deed of Trust from MERS to CitiMortgage, not a doctored-up or Photoshopped document.

(vii) An explanation as to how such a transfer of assignment of the Deed of Trust to CitiMortgage could be possible yet MERS is a mere "Nominee" and did not own the Note. MERS itself has given sworn testimony UNDER OATH that it does not have the authority to transfer the Note or Deed of Trust to another in MERS v. Nebraska Department of Banking. Several courts have also acknowledged that MERS is not the owner of the underlying Note and therefore could not transfer the Note, the beneficial interest in the Deed of Trust, or foreclose on the property secured by the Deed", citing the cases of: In Re Vargas, California Bankruptcy Court; Walker, Case no. 10-21656-E-11; Landmark v. Kesler, Kansas decision as to lack of authority of MERS; LaSalle Bank v. Lamy, a New York case; and In Re Foreclosure Cases, the "Boyko" decision from Ohio Federal Court. **PLEASE PROVIDE DOCUMENTS (i) through (vii)**

70

The purpose of these documents is to establish who the real owner of the Note is and who has standing to foreclose. **Virtually any company can show up, claim to own the Note, and proceed to foreclose.** We need proof that the Trustee and Trust are legit.

### Elements of Action to Enjoin Trustee's Sale

**268.** This petition contains all the essential elements of an application for a Temporary Restraining Order and a Temporary Injunction required under Tennessee law. This petition sets out the factual background of the dispute, alleging the underlying obligation and describing the collateral covered by the deed of trust.

**269.** This petition and application has not been brought merely for delay, but so that justice may be done.

### Bond Requirement

**270.** When a court grants a temporary restraining order or temporary injunction, it will require the applicant to execute a bond as security in an amount determined by the court. Because the purpose of a restraining order is not to prevent the collection of the debt but merely to prevent a foreclosure sale, the bond that must be provided by the applicant need not be in the amount of the debt. See Lee v. Howard Broadcasting Corp., 305 S.W.2d 629, 636 (Civ. App.-Houston 1957, dis.). Nor must the bond be equal to the value of the property or the interest that will accrue while the injunction remains in force. Metropolitan Life Ins. v. La Mansion Hotels, 762 S.W.2d 646, 653 (Tex. App.-San Antonio 1988, dis. moot). If the debtor is indigent and the property subject to foreclosure is his or her homestead, the debtor may file an affidavit seeking relief from the requirement of filing a bond. The statue says, indigent litigants wishing to file shall

file with their complaint a completed Uniform Civil Affidavit of Indigency as required by Supreme Court Rule 29.

**271.** Plaintiff respectfully requests that this Honorable Court enter an Order immediately restraining the Defendants and any of their agents, assigns, or beneficiaries, from the following:

**[a]** A temporary restraining order be issued without notice to the Defendants, restraining the defendants, their agents, servants, and employees, from directly or indirectly selling or attempting to sell the trust property on March 30, 2011, under the power of sale contained in the deed of trust.

**[b]** The Defendants be cited to appear and show cause, and that on hearing, a temporary injunction be issued enjoining Defendants, their agents, servants, and employees, from directly or indirectly selling or attempting to sell the trust property under the power of sale contained in the deed of trust.

**[c]** The Court cite the Successor Trustee attempting to foreclose on the property, to produce documentation to prove that the loan got into the Trust, (i.e Receipts and Certifications) that will verify this loan is listed as an asset in that Trust.

**[d]** The Defendant Law Firm be required to validate the disputed debt before collecting on it or foreclosing, as required by Federal law. (FDCPA pursuant to 15 USC § 1692g.)

<u>**APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION**</u>

**272.** For the reasons described above, Plaintiff also requests that the Court grant him a Preliminary Injunction and Permanent Injunction to stop the foreclosure.

72

## IX. PRAYER FOR RELIEF

**273.** WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants be cited to appear and answer herein, as required by law, and that Plaintiff have the following relief:

**(a)** A Temporary Restraining Order, Preliminary Injunction and Permanent Injunction be issued without notice to the Defendants, restraining the defendants, their agents, servants, and employees, or representatives from directly or indirectly selling, attempting to sell, or causing to be sold the Plaintiff's property, and an additional Order which punishes severely and sanctions any violation of said Order by any of the Defendants or their representatives.

**(b)** Costs, attorneys' fees, and such additional relief as the Court may deem just and proper that the Plaintiff is entitled to and punitive damages as may be necessary and appropriate to punish the past and present and deter future reprehensible misconduct.

**(c )** Equitable relief as to the clearing and quieting of the title to the Plaintiff's property in relation to the filing of false foreclosure documents and lack of standing.

**(d )** Declaratory Judgment that MERS, CitiMortgage or their agents, servants, employees, or representatives lack the authority and standing to foreclose on the Plaintiff's mortgage.

Dated March 22, 2011

Most respectfully submitted,

Jimmy Collins Jr.
Pro Se
401 S.Mt. Juliet Road #235
PMB 151
MOUNT JULIET, TN 37122

Tel. (505) 603.6530

73